## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **Criminal No. 11-171** |
| **BRIAN McDAID,** | : | |
| a/k/a "Doc," | | |
| a/k/a "Cocky Doc" | : | |

### GOVERNMENT'S CHANGE OF PLEA MEMORANDUM

## I.   Introduction

Defendant Brian McDaid is charged in an indictment, Dkt. No. 1, with three counts of fraud in connection with electronic mail and aiding and abetting, in violation of Title 18, United States Code, Sections 1037(a)(3) and 2. This case arises from the defendant's ownership and operation of Sili Neutraceuticals, LLC, a company marketing and selling pills, which he caused to be marketed through spam emails, in violation of the CAN-SPAM Act. A change of plea hearing is scheduled for January 26, 2012, at 9:30 a.m.

## II.   Plea Agreement

No plea agreement has been executed.

## III.   Essential Elements of the Offenses

Fraud in Connection with Electronic Mail (18 U.S.C. § 1037(a)(3))

To convict a defendant of fraud in connection with electronic mail, the government must prove beyond a reasonable doubt each of the following elements:

1.      Defendant materially falsified the header information of multiple e-mail messages;

2.      the e-mail messages were commercial in nature;

3.      defendant intentionally caused the transmission of such e-mail messages;

4.      defendant caused the transmission of more than 2,500 such e-mail messages during a 24-hour period; 25,000 during a 30-day period, and 250,000 during a 1-year period; and

5.      the e-mail messages were transmitted in or affected interstate or foreign commerce.

18 U.S.C. § 1037(a)(3), (b)(2)(C). For each of the Counts, defendant McDaid is also charged with aiding and abetting. 18 U.S.C. § 2. The elements for aiding and abetting are:

1.      That the principal committed the offense charged by committing each of the elements of the offense charged;

2.      defendant knew that the offenses charged were going to be committed or were being committed by the principals;

3.      defendant knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, encouraging the principal in committing the specific offenses charged and with the intent that the principal commit those specific offenses; and

4.      defendant's acts did, in some way, aid, assist, facilitate, encourage, the principals to commit the offenses. The defendant's acts need not themselves be against the law.

Third Circuit Model Jury Instructions (Criminal), 7.02.

## IV.    **Maximum Penalties**

Each conviction under 18 U.S.C. § 1037 (fraud in connection with electronic mail) is punishable by 3 years imprisonment, 3 years supervised release,

2

a $250,000 fine, and a $100 special assessment. This is due to various reasons, including that the volume of electronic mail messages transmitted in furtherance of the offense exceeded 2,500 during any 24-hour period, 25,000 during any 30-day period, or 250,000 during any 1-year period, <u>see</u> 18 U.S.C. § 1037(b)(2)(C), and because the offense was undertaken by the defendant in concert with three or more other persons with respect to whom the defendant occupied a position of organizer or leader, <u>see</u> 18 U.S.C. § 1037(b)(2)(F).

Thus, the defendant faces a **<u>total statutory maximum sentence</u>** of nine years imprisonment, a 3-year term of supervised release, a $750,000 fine, and a $300 special assessment. In addition, supervised release may be revoked if its terms and conditions are violated; in this case, the original term of imprisonment may be increased by up to one year per count of conviction. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

## V.   <u>Factual Basis for the Plea</u>

If this case were to proceed to trial, the government would introduce evidence which would establish all the facts contained in the indictment, including:

At all relevant times, defendant McDaid was the sole owner of Sili Neutraceuticals which marketed and sold herbal, weight loss, and other pills made

by a company in New Jersey.[1] To sell these pills, McDaid was in charge and hired

"affiliates" who, in exchange for a commission, marketed his products online. Those

affiliates reported to McDaid. McDaid advertised that he was looking for affiliates

on www.bulkbarn.com, which was a website dedicated solely to sending unsolicited

bulk e-mail ("spam" email), and to exchanging tips and tricks about sending spam

email, which typically contains false and misleading header information, with

subject lines that do not accurately reflect the content of the message, without a

valid physical postal address of the sender, and without a clear and conspicuous

explanation about how the unwilling recipient could opt out of future unsolicited

emails. Through www.bulkbarn.com, McDaid hired at least three affiliates, Robert

DiSalvo, Don Abadie, and Patrick Pruneau, all of whom would testify at trial

substantially that after responding to McDaid's online advertisement for affiliates,

he hired them to send spam email for his pills.

      To track their commissions based on pill sales, McDaid did two main

things. First, his system required each affiliate to have a unique name (DiSalvo was

"Dancer_3," Abadie was "Superhawk," and Pruneau was "Pat P.") through which

they communicated with him. Second, upon request McDaid frequently assigned to

his affiliates unique domain names with websites such as www.hg-pills.com. These

websites routed individuals to an ordering and payment database registered to

McDaid (which he rented and paid for with his credit card) and exclusively

controlled; as a result, he sold millions of dollars worth of pills. McDaid had bought

---

[1] At trial, the government would also introduce expert testimony and other evidence from a related Federal Trade Commission investigation showing that these pills do not work as advertised.

and registered these domain names under false names and addresses, and the websites were hosted on a "bulletproof servers" abroad to avoid being shut down for sending spam email. Affiliates would list the unique domain names assigned to them (such as www.hg-pills.com) on the millions of spam emails they sent on his behalf – as a result, McDaid could track pill sales back to a specific website and pay the commission to the appropriate affiliate.

The affiliates would testify that they frequently had to ask McDaid for multiple fresh domain names at a time because anti-spam groups, ISPs, spam filters, and others, having learned of www.hg-pills.com, for example, would cause the domain names and the websites to shut down, and they had to abandon the domain name and send spam email linking to another domain name. For example, the three affiliates would ask for – and almost immediately receive – fresh domain names from McDaid, often days apart, as follows:

| Date of Request | Date of Receipt | Domain Name | Requester |
|---|---|---|---|
| 12/24/05 | 12/24/05 | www.extra-cared.com<br>www.curegreen.com | DiSalvo |
| 2/5/06 | 2/6/06 | www.dp-yellow.com<br>www.dy-blue.com | Pruneau |
| 2/10/06 | 2/10/06 | www.ld-white.com<br>www.ld-yellow.com<br>www.ld-magenta.com | Pruneau |
| 2/25/06 | 2/25/06 | www.prosdiet.com<br>www.nutritious-all.com | Pruneau |
| 3/5/06 | 3/5/06 | www.og-hood.com<br>www.zg-hood.com | Abadie |
| 3/15/06 | 3/16/06 | www.gdgive.com<br>www.omred.com<br>www.gkgreen.com | Pruneau |
| 3/21/06 | 3/21/06 | www.encouragegood.com<br>www.decidegood.com | DiSalvo |
| 3/23/06 | 3/23/06 | www.retwhite.com<br>www.retgreen.com | DiSalvo |
| 3/24/06 | 3/24/06 | www.viewmvpre.com | DiSalvo |
| 4/2/06 | 4/3/06 | www.df-green.com<br>www.df-yellow.com | Abadie |

| | | www.hg-pills.com<br>www.hg-prevent.com | |
|---|---|---|---|
| 4/20/06 | 4/20/06 | www.enowhglet.com<br>www.esethgnow.com | Pruneau |

In all, a total of 58 domain names assigned to DiSalvo resulted in pill orders; a total of 69 domain names assigned to Abadie resulted in orders; a total of 19 domain names assigned to Pruneau resulted in orders. After receiving these domain names from McDaid, the affiliates would blast millions of spam emails advertising pills on his behalf. Each affiliate would buy or obtain lists of millions of email addresses and use software program designed to deliver hundreds of thousands of emails in a short period of time using proxy servers (to mask the IP address, or the source of the spam email). Each affiliate also used various techniques to avoid detection and evade spam filters, including sending spam email with false and misleading header information, with subject lines that did not accurately reflect the content of the message, without a valid physical address of the spammer or Sili Neutraceuticals, and without any clear explanation of how a spam recipient could opt out of receiving future email. The government would introduce spam emails sent, thousands of which were caught in spam traps used by Microsoft's Hotmail email system. A representative from Microsoft would testify about how spam emails are trapped and identified. These emails are not CAN-SPAM compliant. DiSalvo would testify that during his relationship with McDaid, he was sending out approximately 30 million e-mails a week in 2005; Pruneau would testify that through a program, he sent about 100,000 emails per hour.

The government would also introduce the testimony of J.M., a cooperating witness who was a former affiliate, along with Skype chat logs – real-time written recordings of dialogue between J.M. (screen name "yaybun"), and defendant McDaid (screen name "cockydoc"). These chat logs similarly reflect conversation revolving around obtaining domain names, email address or lists, domain names, money, payment including wire transfers, prepaid credit cards, IP addresses, and promoting pills for McDaid, and references to spam and spamming.

McDaid, as a result of the spam emails and subsequent pill sales, which he sent in interstate commerce, wired commissions into his affiliates' bank accounts. As bank and other records would show, between about July 27, 2005 and March 29, 2006, McDaid wired $14,716 into DiSalvo's bank account; between August 5, 2005 and November 30, 2005, he wired $22,318 into Abadie's bank account; and between November 23, 2005 and May 17, 2006, he wired payments totaling $6,951 into Pruneau's accounts. In addition to bank records, the government would also introduce internal documents received from a server registered to McDaid's account which track the identities of the above spammers, and itemize the payments from Sili Neutraceuticals to each spammer, along with unique identifier, personal information, and wire information. Other documents, called "tickets," document requests from the spammers to McDaid for domain names to put into their spams.

This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offenses charged.

Respectfully submitted,
ZANE DAVID MEMEGER
United States Attorney


*s/ Alexander T.H. Nguyen*
ALEXANDER T.H. NGUYEN
Assistant United States Attorney

Dated: January 26, 2012

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the GOVERNMENT'S CHANGE OF PLEA

MEMORANDUM has been filed electronically on the Electronic Case Filing system

and is available for viewing and downloading from the ECF system, and/or was

served by electronic mail on the following defense counsel:

Mark E. Cedrone, Esq.
Law Offices of Mark E. Cedrone PC
123 S. Broad Street, Ste. 810
Philadelphia, PA 19109
mec@cedrone-law.com

*s/ Alexander T.H. Nguyen*
ALEXANDER T.H. NGUYEN
Assistant United States Attorney

Dated: <u>January 19, 2012</u>